UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CENTURION INVESTMENTS, INC. d/b/a AVMATS )<br><br>        Plaintiff,          )<br><br>vs.                     )<br><br>KEVIN MALUTINOK,       )<br><br>Serve at:    405 Adeleine Drive  )<br>            Columbia, IL 62236  )<br><br>DASSAULT AIRCRAFT SERVICES CORP. )<br><br>Serve at:    Corporation Service Company )<br>            2711 Centerville Road, Ste. 400 )<br>            Wilmington, DE 19808    )<br><br>            Defendants.          ) | Cause No. |

## COMPLAINT

COMES NOW Plaintiff Centurion Investments, Inc. d/b/a AVMATS ("AVMATS") and

for its cause of action for injunctive and other relief against Defendants Kevin Malutinok and

Dassault Aircraft Services Corp. ("Dassault") states as follows:

### PARTIES, JURISDICTION AND VENUE

1.     AVMATS is a citizen of Missouri in that it is a Missouri corporation with its

principal place of business in Chesterfield, Missouri.

2.     Defendant Kevin Malutinok is a Delaware citizen.

3.     Defendant Kevin Malutinok is subject to personal jurisdiction in this Court in that

Malutinok was an employee of AVMATS in St. Louis County, Missouri at all relevant times

herein, and AVMATS' claims against Malutinok arise out of Malutinok's actions in St. Louis

County, Missouri. Furthermore, at relevant times herein, Malutinok was also acting as an agent and employee of Dassault.

4.      Defendant Dassault is a citizen of Delaware in that it is a Delaware corporation with its principal place of business in Delaware.

5.      Dassault is subject to personal jurisdiction in this Court in that Dassault, by and through Malutinok and other agents and employees, committed tortious acts in Missouri and intentionally directed its tortious conduct at AVMATS in Missouri, and this cause of action arises from Dassault's conduct in Missouri and Dassault's conduct directed at AVMATS in Missouri.

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332 in that this case involves a federal question, and there is complete diversity of citizenship among the parties, and the amount in controversy in this action exceeds $75,000.00.

7.      Venue is appropriate in this district because the events giving rise to this claim occurred in the Eastern District of Missouri. The cause of action that is the subject of this lawsuit accrued in St. Louis County, Missouri through the misappropriation of trade secrets and computer data, breach of the duty of loyalty, breach of a confidentiality agreement, computer tampering, and/or civil conspiracy by Defendants in St. Louis County, and St. Louis County is the location of the resulting harm to AVMATS.

## BACKGROUND

8.      AVMATS is a family-owned, St. Louis-based company, with its headquarters at the Spirit of St. Louis Airport. AVMATS was founded in 1978 by Arthur C. ("Butch") Giessman. AVMATS is an independent provider of aircraft parts and service for small corporate aircraft, such as Sabreliner, Hawker, and Falcon aircraft. Among other things, AVMATS provides maintenance, interior services, avionics repairs and installations, major airframe repair,

modifications and inspections for corporate aircraft. (Declaration of Arthur C. ("Butch") Giessman, at ¶ 3.)

9.      Corporate jets routinely need to be inspected and maintained to remain flight-worthy and to comply with FAA regulations. Thus, aircraft owners will request bids from maintenance facilities, like AVMATS' facility at Spirit of St. Louis Airport (the "Spirit Facility"), to provide periodic inspection and routine maintenance work specified by the manufacturer or an approved maintenance program. After a bid is accepted by a customer, the aircraft is brought to AVMATS' Sprit Facility for the scope of work set forth in the bid ("Bid Scope"). During performance of the Bid Scope, AVMATS identifies areas of the aircraft that are in need of maintenance or repair resulting from the inspections ("Work Resulting"). Following completion of the Bid Scope, AVMATS quotes the Work Resulting and is usually selected to complete the Work Resulting because the aircraft is already disassembled and disabled at the Spirit Facility. Thus, winning an inspection bid is, therefore, a critical part of the process for obtaining maintenance business, because the inspection generally gives rise to opportunities to provide significant additional Work Resulting for an aircraft. (*Id.* at ¶ 4.)

10.     From an aircraft owner's perspective, two important aspects for an inspection and routine maintenance bid are: (1) the price charged for the services; and (2) the amount of time during which the aircraft will be out of service while the work is performed (i.e. downtime). AVMATS seeks to minimize both of these elements in order to provide competitive bids. *Id.* at ¶ 5.

11.     The Falcon model aircraft is a jet manufactured by a French company, Dassault Aviation. The Falcon model aircraft is popular among private and public companies for use as a

private company jet and also popular with governmental entities for various governmental and military uses. (*Id.* at ¶ 6.)

12.    AVMATS' maintenance business for the Falcon model aircraft is one of the most profitable and growing part of AVMATS' overall business. AVMATS' Falcon model aircraft maintenance operations have grown significantly over the last two years, making such maintenance operations a vital part of AVMATS' overall business. (*Id.* at ¶ 7.)

13.    AVMATS' Falcon business's success is due in large part to AVMATS' ability to attract and retain corporate and governmental customers with Falcon aircraft. (*Id.* at ¶ 8.)

14.    AVMATS has developed and maintains trade secrets, including but not limited to the following: (1) model-specific and customer-specific information for the Falcon model aircraft it services, including, but not limited to, information about customers' aircraft, customer contact information, written bids to individual customers, and bidding formulas for Falcon model aircraft, which allows it to quickly provide competitive bids for inspection and maintenance services, and minimize the downtime for its customers' aircraft; (2) customer lists; (3) prospective customers; and (4) AVMATS' financial information. This information is hereinafter collectively referred to as AVMATS' "Trade Secrets." (*Id.* at ¶ 9.)

15.    It would be extremely difficult for someone outside of AVMATS who is not obligated to maintain the confidentiality of such information to recreate the information that constitutes AVMATS' Trade Secrets and that enables AVMATS to run a profitable business while providing efficient, competitive, and quality maintenance services to its customers at competitive prices. (*Id.* at ¶ 10.)

16.    The information constituting AVMATS' Trade Secrets is of tremendous value to AVMATS. By maintaining the secrecy of its Trade Secrets, AVMATS is able to compete more

4

effectively with other aircraft maintenance and service providers, including larger, OEM-owned

aircraft maintenance and service providers, such as Defendant Dassault. (*Id.* at ¶ 11.)

17.     Because of the importance of AVMATS' Trade Secrets to AVMATS, AVMATS

as a matter of regular course and conduct requires all employees who may be permitted access to

AVMATS' Trade Secrets sign an acknowledgement form wherein such employees acknowledge

receipt of AVMATS' Employee Handbook, which requires, among other things, that AVMATS'

employees keep confidential information strictly confidential and not release any information

outside of AVMATS. AVMATS' Trade Secrets generally are not available to third parties

outside of AVMATS, nor can they be accessed without direct access to AVMATS' computer

system or on-site files. Bids that are submitted to customers are identified in transmittal

correspondence as "CONFIDENTIAL & PRIVILEGED." In addition, AVMATS maintains

other reasonable safeguards to guard its Trade Secrets. These safeguards include, but are not

limited to: requiring AVMATS employees to enter a unique password to access AVMATS'

network; limiting access to AVMATS' Trade Secrets to employees with a legitimate business

reason for knowing such information; and requiring employees to review and adhere to

AVMATS' confidentiality policies. Moreover, AVMATS has shredders strategically located for

employee use throughout each of its facilities, which employees have been instructed to use to

shred confidential information after it is no longer needed, including but not limited to any

documents that identify a customer or contain financial information. In addition, AVMATS

requires its vendors to sign non-disclosure agreements for all confidential or proprietary data sent

outside of the company. (*Id.* at ¶ 12.)

## MALUTINOK'S EMPLOYMENT WITH AVMATS

18.     AVMATS hired Defendant Malutinok on or about December 30, 2005.

Malutinok was hired as AVMATS' Director of Business Development. Eventually, Malutinok

was promoted to the position of Vice President and General Manager of AVMATS' maintenance division. AVMATS' maintenance division is headquartered at its Spirit Facility. At the time of his resignation, Malutinok was the highest ranking employee in AVMATS' maintenance division. (*Id.* at ¶ 13.)

19.    Malutinok was responsible for overseeing millions of dollars of AVMATS' sales (inspection and maintenance services), and was given access to and detailed knowledge of all aspects of AVMATS' business, including AVMATS' Trade Secrets and its other confidential information. He had direct contact with AVMATS' customers and potential customers. (*Id.* at ¶ 14.)

20.    As Director of Business Development and as Vice President and General Manager of AVMATS' maintenance division, Malutinok was a very effective sales person, and was tasked with, and contributed to, the growth of AVMATS' Falcon model aircraft business. (*Id.* at ¶ 15.)

21.    As a result of his responsibilities at AVMATS, Malutinok was highly compensated by AVMATS. (*Id.* at ¶ 16.)

## CONFIDENTIALITY AGREEMENT

22.    On September 7, 2006, Malutinok signed an Employee Acknowledgment form (the "Confidentiality Agreement"). (A true and accurate copy of the Confidentiality Agreement and relevant portions of the Employee Handbook is attached hereto as Exhibit A, and incorporated herein by reference); (*See also* A. Giessman Decl., at ¶ 17.)

23.    In the Confidentiality Agreement, Malutinok acknowledged that he received and reviewed AVMATS' Employee Handbook and the policies and practices described within it. (Exhibit A.) AVMATS' Employee Handbook prohibits:

W.    Removal from Company premises, or disclosure of,

employee lists, Company records, or forms of confidential material of any sort, including, but not limited to:

> ALL FORMS, OVERHAUL MANUALS, TECHNICAL ORDERS, BLUEPRINTS AND CONTRACTS IN THE POSSESSION OF THE COMPANY, WHETHER OR NOT GENERATED ORIGINALLY BY THE COMPANY, OR PROPERTY OF THE COMPANY, ARE NOT TO BE REPRODUCED FOR USE OUTSIDE OF THE COMPANY. SOME DOCUMENTS HAVE BEEN CERTIFIED AS "SECURE" TO THE U.S. DEFENSE DEPARTMENT BY *AVMATS*, AND ANY VIOLATION OF THIS CERTIFICATION CAN RESULT IN FINES AND IMPRISONMENT. A.C. "BUTCH" GIESSMAN IS THE <u>ONLY</u> PERSON IN THE COMPANY AUTHORIZED TO RELEASE ANY TECHNICAL DATA IN THE POSSESSION OF THE COMPANY TO ANY BUSINESS, INDIVIDUAL, OR GOVERNMENTAL ENTITY OUTSIDE *AVMATS*.

(*Id.*) AVMATS' Employee Handbook further states:

> CONFIDENTIAL INFORMATION
>
> Protecting our Company's information is the responsibility of every employee, and we all share a common interest in making sure it is not improperly or accidentally disclosed. Therefore, do not discuss the Company's confidential business with anyone who is not employed by *AVMATS*. Failure to abide by this policy will result in the imposition of discipline.

(*Id.*).

24.    On February 1, 2008, AVMATS published Revision #2 to AVMATS' Employee Handbook, expanding the Confidential Information section in the Employee Handbook. (A true and accurate copy of Revision #2 to the Employee Handbook, dated February 1, 2008, is attached hereto as Exhibit B, and incorporated herein by reference). A copy of Revision #2 was delivered to each employee, including Malutinok, with their paychecks on or about February 8, 2008, with instructions to add Revision #2 to the employee's Employee Handbook. (A. Giessman Decl., at ¶ 18.)

25.    Revision # 2 to AVMATS' Employee Handbook expanded the definition of Confidential Information, stating:

CONFIDENTIAL INFORMATION

Protecting our Company's information is the responsibility of every employee, and we all share a common interest in making sure it is not improperly or accidentally disclosed. Therefore, do not discuss the Company's confidential business with anyone who is not employed by *AVMATS* unless there is a need to know. Failure to abide to this Policy will result in the imposition of discipline.

In order to protect against the inadvertent disclosure of our Company's confidential information, the following types of documents and records shall be shredded prior to disposal:

1. Any financial information such as credit card receipts, bills, invoices statements, checks, ledgers, balance sheets, or other documents containing financial, account or customer information;

2. ***Any bid, quotation, invoice edit, work order, customer list(s), Monthly Status Sheets, or other documents containing information on customers, charges, costs, discounts, labor rates, hours or pricing***;

3. Any document, drawing, or presentation stamped or marked as "Confidential", "Proprietary" or "Sensitive" or other restrictive distribution statement;

4. Any document containing employee information, addresses, phone numbers, social security numbers, or other personally identifiable data;

5. Computer Discs, CD's, DVD's, Computers, external hard drives, USB Thumb Drives, Flash Drives, electronic media, etc. that have had any confidential information saved or copied onto them should be forwarded to the Company IT department for disposal.

The above list is intended to be a guide. If there is a question as to whether a particular type of document, media, or storage device should be shredded or otherwise rendered unusable prior to disposal, ask your supervisor. If a question remains, please contact [AVMATS' General Counsel].

The locations of shredders within each facility may vary. If you are unsure of the location in your facility, please check with your supervisor.

(Exhibit B.) (emphasis added).

## **MALUTINOK ACCEPTS EMPLOYMENT FROM DASSAULT**

26.     Dassault is a service and maintenance subsidiary of the aircraft manufacturer and

OEM parts manufacturer, Dassault Aviation. (A. Giessman Decl., at ¶ 19.)

27.    Dassault's service and maintenance work is performed exclusively on Dassault Falcon aircraft. (*Id.*)

28.    Upon information and belief, Malutinok began negotiating with Dassault about potential employment opportunities around the spring of 2008.

29.    Sometime prior to June 16, 2008, Malutinok accepted an offer of employment from Dassault. Malutinok was hired by Dassault to perform the same role he had performed for AVMATS. Specifically, in a memorandum to all of Dassault's employees, dated June 19, 2008, from Robert Sundin, Senior Vice President and Chief Operating Officer of Dassault, Dassault announced that Malutinok was hired for the position of "Vice President and General Manager of the Wilmington Service Center" and observed that while Malutinok was employed by AVMATS "he was responsible for the entire Spirit of St. Louis Airport facility." (A true and accurate copy of an email dated June 19, 2008, with a memorandum from Robert Sundin attached thereto, is attached hereto as Exhibit C, and is incorporated herein by reference); (*see also* Declaration of Justin Giessman, at ¶ 3.a.)

30.    Malutinok submitted his voluntary resignation to AVMATS on or about June 16, 2008. Malutinok and AVMATS mutually agreed that Malutinok's last day of employment at AVMATS would be July 10, 2008. (A. Giessman Decl., at ¶ 20.)

### MALUTINOK BEGINS ACTING AS AN AGENT FOR DASSAULT BEFORE LEAVING AVMATS AND MISAPPROPRIATES AVMATS' CONFIDENTIAL INFORMATION AND TRADE SECRETS

31.    Unbeknownst to AVMATS, before his last day of employment with AVMATS (July 10, 2008), Malutinok began working as an agent of Dassault and to the detriment of AVMATS. (*Id.* at ¶ 21).

32.    Dassault provided Malutinok with business cards, a Dassault email address, a cellular telephone, and a laptop computer with a Verizon internet card. (*Id.* at ¶ 22).

33.     While still employed by AMVATS, Malutinok was handing out Dassault business cards to AVMATS customers within AVMATS' facilities during AVMATS' business hours. (*Id.* at ¶ 23).

34.     In addition, a recent forensic review of the AVMATS laptop computer used by Malutinok while working for AVMATS has revealed that after Malutinok submitted his resignation to AVMATS on June 16, 2008, but before his last day of employment with AVMATS on July 10, 2008, Malutinok was acting as an agent for Dassault.  In fact, Malutinok emailed numerous AVMATS' Trade Secrets and confidential information to Dassault.  (*Id.* at ¶ 24).

35.     By June 19, 2008, Malutinok was already soliciting on behalf of Dassault one of AVMATS' prospective customers, a Fortune 500 company with at least six Falcon jets.  On June 19, 2008, Malutinok sent an email to a vice president at Dassault informing him that Malutinok had just met with members of that prospective customer's crew and that securing the business was "a true possibility."  (A true and accurate copy of an email from Malutinok's AVMATS email to Todd Frisbie, dated June 19, 2008, is being filed under seal as Exhibit D hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.b.)

36.     On June 23, 2008, Malutinok sent Dassault a copy of AVMATS' form for requesting a quote.  (A true and accurate copy of an email from Malutinok to Todd Frisbie, Vice President of Sales and Marketing for Dassault, dated June 23, 2008, is attached hereto as Exhibit E, and incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.c.)

37.     Three days before sending specific information to Dassault about AVMATS' bid for work on a Falcon 50 jet, Malutinok requested the names of the "entire … crew" for that jet. (A true and accurate copy of an email from Malutinok's AVMATS email to Rich Vollmar, dated

June 23, 2008, is being filed under seal as Exhibit F hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.d.) Because of recent changes in the customers' crew, Malutinok needed the names of the customer crew in order to ensure that he and/or Dassault would have current contact information for the customer. (J. Giessman Decl., at ¶ 3.d.)

38.    On June 25, 2008, Malutinok circulated an email to a number of AVMATS' Falcon aircraft customers providing his new email address and cellular telephone number for Dassault. (A true and accurate copy of an email from Malutinok's AVMATS email, dated June 25, 2008, is being filed under seal as Exhibit G hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.e.)

39.    On June 26, 2008, Malutinok forwarded to his Dassault email address numerous AVMATS Trade Secrets, including the following customer bids made by AVMATS for inspection and maintenance services on Falcon model aircraft to customers or potential customers of AVMATS:

a.     AVMATS' proposal for an inspection and performance of Service Bulletin work on a Falcon 50 jet (a true and accurate copy of an email from Malutinok's AVMATS email address to his Dassault email address, dated June 26, 2008, with the attached proposal, is being filed under seal as Exhibit H hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.f.);

b.     AVMATS' proposal for an inspection and windshield inspection on a Falcon 200 jet (a true and accurate copy of an email from Malutinok's AVMATS email address to his Dassault email address, dated June 26, 2008, with the attached proposal, is being filed under seal as Exhibit I hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.g.);

c.     AVMATS' proposal for an inspection, component services, and landing gear overhaul work on a Falcon 2000 jet (a true and accurate copy of an email from Malutinok's AVMATS email address to his Dassault email address, dated June 26, 2008, with the attached proposal, is being filed under seal as Exhibit J hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.h.);

d.   AVMATS' proposal for an inspection and routine maintenance work (completed on June 14, 2008) on a Falcon 50 jet (a true and accurate copy of an email from Malutinok's AVMATS email address to his Dassault email address, dated June 26, 2008, with the attached proposal, is being filed under seal as Exhibit K hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.i.)

e.   AVMATS Proposals for Avionics Modifications, and for an inspection work on a Falcon 2000 jet (a true and accurate copy of an email from Malutinok's AVMATS email address to his Dassault email address, dated June 26, 2008, with the attached proposals, is being filed under seal as Exhibit L hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.j.); and

f.   AVMATS' proposal to for an inspection, Avionics Modifications, and Wing Fuel Tank (Tank-n-Plank) inspection work on a Falcon 50 jet (a true and accurate copy of an email from Malutinok's AVMATS email address to his Dassault email address, dated June 26, 2008, with the attached proposal, is being filed under seal as Exhibit M hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.k.).

40.    By misappropriating the foregoing emails (Trade Secrets) for Dassault, Malutinok and Dassault are able to unfairly compete against AVMATS and divert AVMATS' customers and potential customers to Dassault because Defendants would have AVMATS' pricing, bidding formulas, and customer information for the following Falcon model aircraft: Falcon 50, Falcon 200, and Falcon 2000. (A. Giessman Decl., at ¶ 25).

41.    The bids stolen by Malutinok were for later model, high-value Falcon aircraft ($10 million to $20 million) that typically generate higher revenue than other Falcon aircraft. These are the types of Falcon aircraft that Dassault targets for inspection and maintenance services. (*Id.* at ¶ 26).

42.    On July 3, 2008, a Vice President of Dassault sent Malutinok an email about work that Dassault was pursuing for a Falcon 50 jet. (A true and accurate copy of the email from Todd Frisbie of Dassault to Malutinok, dated July 3, 2008, is being filed under seal Exhibit N hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.l.) This was **the**

*same work for the same jet* identified in an AVMATS' bid that Malutinok forwarded to Dassault on June 26, 2008 (Exhibit M); (*see also* J. Giessman Decl., at ¶ 3.l.) Because Malutinok was concerned that this email was sent to his AVMATS email account rather than his Dassault or personal email accounts, Malutinok cautioned the Dassault Vice President about sending this email to his AVMATS email address.

43.    On July 8, 2008, two days before his employment terminated at AVMATS, Malutinok sent to his Dassault email address a very sensitive trade secret of AVMATS – a detailed list of: (a) *all* of AVMATS' customers with aircraft currently at the Spirit facility for inspection and/or maintenance jobs; (b) *all* of AVMATS' customers who had accepted bids from AVMATS and were scheduled for inspections and/or maintenance; and (c) *all* of the customers to whom AVMATS had submitted outstanding bids. (A true and accurate copy of an email from Malutinok's AVMATS email address to his Dassault email address, dated July 8, 2008, with the attached list, is being filed under seal as Exhibit O hereto, and is incorporated herein by reference); (*see also* J. Giessman Decl., at ¶ 3.m.) This list identified 17 Falcon customers with open bids from AVMATS. By misappropriating this Trade Secret, Defendants are able to unfairly compete against AVMATS and divert many AVMATS customers and potential customers to Dassault because the list identifies the customers by name, identifies the customer's aircraft by model and tracking numbers, and identifies the specific work that needs to be performed on each aircraft. (J. Giessman Decl., at ¶ 3.m.)

44.    While still employed by AVMATS, Malutinok also solicited a number of AVMATS employees for employment at Dassault. (A. Giessman Decl., at ¶ 27.)

45.    In committing all of the foregoing conduct, Malutinok acted on behalf of himself, individually, and as a representative, employee, and agent of Dassault.

46.     By virtue of his position with AVMATS, Malutinok developed relationships with many of AVMATS' Falcon model customers, and through these relationships, together with the Trade Secrets that Malutinok and Dassault misappropriated from AVMATS, Malutinok and Dassault are able to solicit and divert these customers, directly or indirectly, and consistently underbid AVMATS for their business. Aircraft manufacturers (such as Dassault Aviation) publish a maintenance manual that sets forth how and when to inspect their jets. Thus, the companies that inspect the jets perform the same inspections. As a result, the price of the inspection is critical to getting the inspection business, which then generally leads to maintenance work on the jet aircraft. By misappropriating numerous bids that AVMATS has provided to its customers and potential customers for inspection of various models of Falcon aircraft, and because of Malutinok's relationships with AVMATS' customers and his knowledge of AVMATS' Trade Secrets, Defendants can unfairly compete with AVMATS and divert significant Falcon model business from AVMATS by offering lower pricing for inspection services to induce AVMATS' Falcon customers to give their business to Dassault. (*Id.* at ¶ 28.)

## COUNT I

## VIOLATION OF THE MISSOURI UNIFORM TRADE SECRETS ACT— KEVIN MALUTINOK

47.     The allegations stated in Paragraphs 1 through 46 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

48.     AVMATS derives independent economic value from AVMATS' Trade Secrets. AVMATS' Trade Secrets are not generally known to, and not readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

49.     Furthermore, AVMATS' Trade Secrets are the subject of reasonable efforts to maintain secrecy, including but not limited to requiring AVMATS' employees (including

Malutinok) to adhere to AVMATS' confidentiality policies, limiting access to employees with a legitimate business reason for knowing such information, and maintaining physical, electronic, and procedural safeguards.

50.     Through his position of employment with AVMATS, Malutinok had access to AVMATS' confidential and proprietary information, including AVMATS' Trade Secrets.

51.     By virtue of the Confidentiality Agreement and/or the duty of loyalty Malutinok owed to AVMATS, Malutinok knew or had reason to know that he acquired AVMATS' Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

52.     Malutinok misappropriated AVMATS' Trade Secrets by, *inter alia*:

    a.     acquiring AVMATS' Trade Secrets and/or acquiring other of AVMATS' Trade Secrets with reason to know that said Trade Secrets were acquired by improper means;

    b.     accessing, using, and/or disclosing AVMATS' Trade Secrets for his and/or Dassault's benefit without AVMATS' knowledge or consent.

53.     Malutinok has acted with evil motive or with reckless indifference to the rights of AVMATS.

54.     Malutinok's misappropriation of Trade Secrets has caused substantial and irreparable damage to AVMATS by giving him and/or Dassault an unfair competitive advantage over AVMATS and placing them in a position to divert substantial business from AVMATS.

55.     Unless Malutinok is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten AVMATS' business, and AVMATS will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

56.     Through the factual allegations contained herein, AVMATS has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a

balancing of the equities favors the entry of an injunction against Malutinok.

## COUNT II

### VIOLATION OF THE MISSOURI UNIFORM TRADE SECRETS ACT— DASSAULT

57.     The allegations stated in Paragraphs 1 through 56 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

58.     AVMATS derives independent economic value from AVMATS' Trade Secrets. AVMATS' Trade Secrets are not generally known to, and not readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

59.     Furthermore, AVMATS' Trade Secrets are the subject of reasonable efforts to maintain secrecy, including but not limited to requiring AVMATS' employees (including Malutinok) to adhere to AVMATS' confidentiality policies, limiting access to employees with a legitimate business reason for knowing such information, and maintaining physical, electronic, and procedural safeguards.

60.     Dassault knew that Malutinok was subject to a duty of loyalty that prohibited him from disclosing AVMATS' Trade Secrets.  Dassault further knew that Malutinok obtained and/or disclosed AVMATS' Trade Secrets and other confidential information without AVMATS' knowledge or consent.

61.     Dassault requested from, acquired from, and/or received AVMATS' Trade Secrets from Malutinok, and has and will continue to accept and use AVMATS' Trade Secrets for financial gain in the course of competing against AVMATS' in markets common to both Dassault and AVMATS and for customers available to both entities.

62.     By acquiring, disclosing, and/or utilizing AVMATS' Trade Secrets, Dassault's actions constitute actual and threatened misappropriation of trade secrets in violation of the

Missouri Uniform Trade Secrets Act, § 417.455 RSMo.

63.    Dassault acted with evil motive or with reckless indifference to the rights of AVMATS.

64.    Dassault's misappropriation of trade secrets has caused substantial and irreparable damage to AVMATS by giving it an unfair competitive advantage over AVMATS and placing it in a position to divert substantial business from AVMATS.

65.    Unless Dassault is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, it will continue to threaten AVMATS' business, and AVMATS will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

66.    Through the factual allegations contained herein, AVMATS has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Dassault.

## COUNT III

### BREACH OF DUTY OF LOYALTY—KEVIN MALUTINOK

67.    The allegations stated in Paragraphs 1 through 66 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

68.    As an employee of AVMATS, Malutinok owed AVMATS a duty of loyalty and was obligated not to compete with or act contrary to the interests of AVMATS.

69.    Malutinok breached his duty of loyalty to AVMATS by engaging in direct competition with and/or acting contrary to the interests of AVMATS while still employed by AVMATS.

70.    Malutinok competed with AVMATS and/or acted contrary to the interests of AVMATS by, *inter alia*:

a.   misappropriating AVMATS' information, documents, and forms for himself and/or Dassault;

b.   working for himself and/or Dassault in competition with AVMATS while still employed by AVAMATS;

c.   soliciting AVMATS employees to leave AVMATS to work for Dassault while still employed by AVMATS.

71.   Malutinok's actions were performed with an evil motive or with reckless indifference to the rights of AVMATS.

72.   As a direct result of the foregoing events and actions undertaken by Malutinok, AVMATS has suffered substantial and irreparable damage because Malutinok has taken Trade Secrets and other confidential information from AVMATS and Malutinok and/or Dassault have received an unfair competitive advantage over AVMATS and are in a position to divert substantial business from AVMATS.

73.   Unless Malutinok is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten AVMATS' business, and AVMATS will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

74.   Through the factual allegations contained herein, AVMATS has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Malutinok.

## COUNT IV

### BREACH OF CONTRACT—KEVIN MALUTINOK

75.   The allegations stated in Paragraphs 1 through 74 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

76.     The Confidentiality Agreement is a valid and enforceable contract between AVMATS and Malutinok.

77.     Malutinok has breached the Confidentiality Agreement by, *inter alia*, removing AVMATS' business records and confidential information from AVMATS' premises and discussing it with persons who are not employed by AVMATS.

78.     Malutinok has breached and threatens to continue to breach the Confidentiality Agreement by, upon information and belief, disclosing, divulging, and sharing AVMATS' Trade Secrets with Dassault.

79.     Through the actions set forth herein, Malutinok has given AVMATS reasonable cause to believe that additional breaches of the Confidentiality Agreement are imminent.

80.     By virtue of the foregoing events and actions undertaken by Malutinok detailed herein, Malutinok and/or Dassault are able to unfairly compete with AVMATS and are in a position to divert substantial business from AVMATS.  Accordingly, Malutinok has caused, and will cause in the future, substantial and irreparable harm to AVMATS, its business and operations, through the violation and continued breach of the Confidentiality Agreement.

81.     Unless Malutinok is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten AVMATS' business, and AVMATS will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

82.     Through the factual allegations contained herein, AVMATS has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Malutinok.

## COUNT V

## VIOLATION OF THE MISSOURI COMPUTER TAMPERING ACT § 537.525, RSMo.— KEVIN MALUTINOK

83.     The allegations stated in Paragraphs 1 through 82 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

84.     Malutinok tampered with AVMATS' computer data by taking and/or disclosing AVMATS' Trade Secrets and other electronically stored information from AVMATS' computers, computer network, and/or computer system without authorization or reasonable grounds to believe that he had such authorization.

85.     AVMATS has been damaged by Malutinok's unauthorized disclosure, taking, receipt, retaining, and/or use of data from AVMATS' computers because it has incurred fees for the examination of certain computers and because Malutinok and/or Dassault have received an unfair competitive advantage over AVMATS and have been placed in a position to divert substantial business from AVMATS.  AVMATS has further been damaged in that it has expended attorneys' fees in connection with this matter.

86.     In taking, receiving, retaining, using, or disclosing data from AVMATS' computer network, and/or computer system, Malutinok's actions were performed with an evil motive or with reckless indifference to the rights of AVMATS.

87.     Unless Malutinok is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten AVMATS' business, and AVMATS will suffer, immediate, substantial, and irreparable harm from the aforesaid actions.

88.    Through the factual allegations contained herein, AVMATS has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Malutinok.

## COUNT VI

## VIOLATION OF THE MISSOURI COMPUTER TAMPERING ACT § 537.525, RSMo.— DASSAULT

89.    The allegations stated in Paragraphs 1 through 88 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

90.    Dassault tampered with AVMATS' computer data by retaining, receiving, using, and/or disclosing AVMATS' Trade Secrets and other electronically stored information from AVMATS' computers, computer network, and/or computer system with the knowledge or belief that said information was acquired by Malutinok without authorization or reasonable grounds to believe that he had such authorization.

91.    AVMATS has been damaged by Dassault's unauthorized disclosure, taking, receipt, retaining, and/or use of data from AVMATS' computers because it has incurred fees for the examination of certain computers and because Dassault has received an unfair competitive advantage over AVMATS and has been placed in a position to divert substantial business from AVMATS.  AVMATS has further been damaged in that it has expended attorneys' fees in connection with this matter.

92.    In receiving, retaining, using, or disclosing data from AVMATS' computer network, and/or computer system, Dassault's actions were performed with an evil motive or with reckless indifference to the rights of AVMATS.

93.    Unless Dassault is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, it will continue to threaten

AVMATS' business, and AVMATS will suffer, immediate, substantial, and irreparable harm from the aforesaid actions.

94.    Through the factual allegations contained herein, AVMATS has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Dassault.

WHEREFORE, AVMATS respectfully requests that this Court grant the relief set forth more fully below, and grant such other relief as this Court deems just and proper.

## COUNT VII

## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030— KEVIN MALUTINOK

95.    The allegations stated in Paragraphs 1 through 94 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

96.    AVMATS' computers are protected computers used in interstate commerce.

97.    Malutinok knowingly, intentionally, and with intent to defraud accessed AVMATS' computers without authorization, or exceeded his authorized access by virtue of breaches of his duty of loyalty to AVMATS and AVMATS' confidentiality policy.

98.    Malutinok obtained information from AVMATS' computers without AVMATS' permission.  Such conduct furthered Malutinok's intended fraud.

99.    By virtue of Malutinok's intentional act of accessing AVMATS' computers without authorization, Malutinok has recklessly caused loss to AVMATS.  AVMATS has suffered damages and a loss of no less than $5,000, including but not limited to its costs to respond to the offense.

100.    Malutinok has acted with evil motive or with reckless indifference to the rights of AVMATS.

101.    By virtue of the foregoing events and actions undertaken by Malutinok detailed herein, Malutinok and/or Dassault are able to unfairly compete with AVMATS and are in a position to divert substantial business from AVMATS.  Accordingly, Malutinok has caused, and will cause in the future, substantial and irreparable harm to AVMATS, its business and operations.

102.    Unless Malutinok is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten AVMATS' business, and AVMATS will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

103.    Through the factual allegations contained herein, AVMATS has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Malutinok.

## COUNT VIII

## CIVIL CONSPIRACY—KEVIN MALUTINOK AND DASSAULT

104.    The allegations stated in Paragraphs 1 through 103 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

105.    Upon a meeting of the minds, Malutinok and Dassault conspired to misappropriate AVMATS' confidential and proprietary information and Trade Secrets, to use and disclose AVMATS' confidential and proprietary information and Trade Secrets, and to compete unfairly against AVMATS, in violation of Missouri law, Malutinok's obligations under his Confidentiality Agreement with AVMATS and/or Malutinok's duty of loyalty to AVMATS.

106.    Malutinok committed overt acts in furtherance of the conspiracy with Dassault by accessing and emailing himself AVMATS' other Trade Secrets and other confidential and proprietary information.

23

107.    Dassault committed overt acts in furtherance of the conspiracy with Malutinok by accepting AVMATS' Trade Secrets and other confidential and proprietary information and using said information for its benefit.

108.    As a direct result of the foregoing events and actions undertaken by Malutinok and Dassault, Malutinok and Dassault have caused damage to AVMATS in that certain of AVMATS' Trade Secrets and other confidential and proprietary information have been disclosed to Malutinok and/or Dassault, giving them an unfair competitive advantage over AVMATS and placing them in a position to divert substantial business from AVMATS.

109.    In participating in the conspiracy, Defendants' actions were performed with an evil motive or with reckless indifference to the rights of AVMATS.

110.    Unless Defendants are temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, they will continue to threaten AVMATS' business, and AVMATS will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

111.    Through the factual allegations contained herein, AVMATS has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Defendants.

### PRAYER FOR RELIEF FOR ALL COUNTS

WHEREFORE, AVMATS respectfully prays for the following relief:

    a.    For a Temporary Restraining Order, and thereafter Preliminary and Permanent Injunctions:

        i.    directing Malutinok and Dassault to immediately return to AVMATS any and all electronic and hard copies of AVMATS' Trade Secrets and all other of AVMATS' confidential and proprietary information; and further directing that after the return to AVMATS of any and all AVMATS' Trade Secrets and all other of AVMATS' confidential and proprietary information, that

Malutinok and Dassault destroy any and all remaining copies of AVMATS' Trade Secrets and any and all remaining copies of AVMATS' other confidential and proprietary information;

ii.    directing that Malutinok and Dassault not turn-on, power-up, or activate any personal computers (including but not limited to any home and work computers) used by Malutinok and/or any employees or agents of Dassault who worked in concert with Malutinok or received emails from Malutinok while he was employed by AVMATS, including but not limited to Todd Frisbie and Robert Sundin, and enjoining Malutinok and Dassault from deleting any data from, reformatting, or taking any other action to alter data contained on any computers (home or work computers), data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment used by Malutinok or any employees and/or agents of Dassault who worked in concert with Malutinok or received emails from Malutinok while he was employed by AVMATS, including Todd Frisbie and Robert Sundin, and further directing that Malutinok and Dassault make available for forensic examination and forensically-sound mirror-imaging at defendants' cost by a computer forensics expert selected by AVMATS within forty-eight (48) hours any such home and work computers data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment used by Malutinok and/or any employees or agent of Dassault's who worked in concert with Malutinok or received emails from Malutinok while he was employed by AVMATS, including but not limited to Todd Frisbie and Robert Sundin;

iii.   directing that within forty-eight (48) hours following inspection and copying by AVMATS' computer forensics expert, Malutinok and Dassault must remove and delete any and all AVMATS' Trade Secrets and all other of AVMATS' confidential and proprietary information from any computers, data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment in their possession or control;

iv.    directing that following the removal and deletion of any and all of AVMATS' Trade Secrets, and all other of AVMATS' confidential and proprietary information from any computers, data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment in their possession or control, Malutinok and Dassault allow a computer forensics expert selected by AVMATS to verify at defendants' cost that any and all of AVMATS' Trade Secrets or any other of AVMATS' confidential and proprietary information has been deleted from any computers, data processing machines, e-mail accounts, wireless e-mail

machines, cellular phones or other equipment used by Malutinok and/or any employees or agents of Dassault who worked in concert with Malutinok or received emails from Malutinok while he was employed by AVMATS;

v.  directing Malutinok and Dassault to provide AVMATS with access to inspect all e-mail accounts (including but not limited to any gmail, hotmail, or yahoo accounts) used for conducting any business of AVMATS and/or Dassault by Malutinok and/or any employees or agents of Dassault who worked in concert with Malutinok or received emails from Malutinok while he was employed by AVMATS, including Todd Frisbie and Robert Sundin, as well as all other information necessary to access and inspect such email accounts;

vi.  enjoining Malutinok and Dassault from soliciting, directly or indirectly, for Dassault or any of its affiliate companies and any other competitor of AVMATS, any customers of AVMATS identified in the exhibits filed under seal and attached hereto in competition with AVMATS for a period of twenty-four (24) months;

vii.  enjoining Malutinok and Dassault and any person or company acting in concert with Malutinok and/or Dassault, including any agents and employees of Dassault or any other competitor of AVMATS, from using, disclosing, copying, revealing or discussing any of AVMATS' Trade Secrets and all other of AVMATS' confidential or proprietary information for a period of sixty (60) months;

b.  For damages in excess of $25,000.00 in an amount that is fair and reasonable;

c.  For AVMATS' attorneys' fees and costs incurred herein; and

d.  For all other such relief that this Court deems to be just and proper.

ARMSTRONG TEASDALE LLP

BY:

William M. Corrigan, Jr.          #2879
Jeffrey L. Schultz                #507243
One Metropolitan Square, Suite 2600
St. Louis, Missouri  63102-2740
(314) 621-5070  (Office)
(314) 621-5065  (Facsimile)
wcorrigan@armstrongteasdale.com
jschultz@armstrongteasdale.com

ATTORNEYS FOR PLAINTIFF CENTURION
INVESTMENTS, INC. d/b/a AVMATS